**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-459-CRC** |
| **ANDREW WILLIAM GRISWOLD,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Andrew Griswold to five months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.   INTRODUCTION

Griswold enthusiastically participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million in losses.[1]

Griswold, the owner of a Florida construction business, pushed his way into the Capitol,

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

past police trying to guard the Rotunda Doors, and then through the building, thrusting his hands in the air and yelling in triumph. He entered the gallery of the Senate Chamber, where he yelled, "this is our house now!"   After leaving the building, he gave an interview on the Capitol steps, where he gloated that Members of Congress "ran and hid" while "we took the building." He threatened, "we will fucking do it again." Later, his jubilation gave way to concern, and Griswold deleted evidence from his phone. He continues to minimize and excuse his conduct.

The government recommends that the Court sentence Griswold to five months' incarceration, which is at the high end of the advisory Guidelines' range of 0-6 months. A high-end sentence reflects Griswold's clear intent to disrupt Congress through intimidation: an intent which he shared in an interview, perhaps hoping to amplify its impact even further. It also accounts for his conduct after the riot, deleting evidence and minimizing his conduct.   Griswold's actions, while not physically violent, are therefore among the most serious of January 6 rioters who are subject to the same guidelines range.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Griswold among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions

were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Griswold's plea agreement, a joint session of Congress convened at approximately 1:00 p.m. at the U.S. Capitol on January 6, 2021. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. As the joint session got underway, the members of crowd began to breach barricades and advance further through Capitol Grounds, toward the Capitol Building.  By approximately 2:00 p.m., certain individuals had forced their way to the exterior of the Capitol Building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the

crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 1-7; PSR ¶¶ 18-24.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Mazzocco*, 21-cr-54 (D.D.C. Oct. 4, 2021 (Doc. 32, Hrg. Tr. at 25 ("A mob isn't a mob without the numbers. The people who were

committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24,

2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than $2.7 million.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

*Griswold's Travel to Washington, D.C. and Approach to the Capitol*

Andrew Griswold traveled by car with his mother, brother, and a friend ("Friend") from Northern Florida to Washington, D.C. to attend the rally in support of President Trump. Griswold believed the election had been stolen and thought this might be one last chance to show support for President Trump while in office.

Griswold and his group attended the rally. As Griswold later explained, he believed that President Trump told him—and everyone at the rally—to go to the Capitol. The group stopped by their hotel first, where Griswold left a flag, concerned that it might be mistaken for a weapon, and put on his warmer camouflage jacket. Griswold's group then made their way to the Capitol. After hearing flash bangs and smelling smoke in the air (likely the battles taking place on the West Front of the Capitol), Griswold went around the building, to the east side. Around that time, Griswold and Friend separated from his brother and mother.

*The Breach of the Rotunda Doors*

While the first breach of the Capitol occurred on the west side, the east side breach occurred not long after. Rioters pushed past barricades and pushed the Capitol Police up the

steps, toward the Rotunda Doors.



Rioters eventually made it all the way up the steps to the doors. A group of police officers, some carrying riot shields, attempted to disperse the crowd, but the crowd was too large to be moved. The crowd, meanwhile, chanted "Stop the steal," "Whose house? Our house!" and "USA!" A loud bang was heard, and a plume of smoke issued from near the door, at around 2:24 p.m., presumably from the discharge of a smoke or tear gas grenade.[2]

At around the same time, from inside the Capitol Building, another rioter approached the Rotunda Doors and used his shoulder to force them open. An employee of the House Sergeant at Arms who was inside the building tried to stop the rioters outside from entering, but he was

_____

[2] Videos depicting the melee outside the Rotunda Doors are available at projects.propublica.org/parler-capitol-videos and are sorted by time stamps. Each of these videos is tagged with a gold "near the Capitol" label. The videos are timestamped at 2:21 p.m. (the first video at this time stamp), 2:23 p.m. (there are two videos with this time stamp, and both are of the eastern Rotunda doors), and 2:25 p.m. (the first video at this time stamp).

overwhelmed by other rioters inside the building and forced away from the door. Rioters outside the doors tried to jam a flag through the door to keep it open. Other members of the exterior crowd assaulted police officers who stood with their backs to the eastern Rotunda door, defending it. Some rioters carried out this assault using chemical spray.[3]

After the rioters inside forced the door open, they pulled a police officer who had been outside through the door, then worked to clear a logjam of bodies outside. Rioters tried to jam their own bodies into the doorframe to keep the door open and fought with officers, pushing and pulling them out of the way. Rioters outside then began to pour in. Officers succeeded in closing the door at approximately 2:28 p.m., after one officer hurled himself through the door and turned his back to the crowd, pushing them back just enough to allow space for the door to close.

While officers stood guard at the doors, and then barricaded the door with benches, tensions outside remained high. Rioters outside continued yelling, chanting, and skirmishing with officers, trying to breach the doors again. By then, Griswold had worked his way toward the front of the group.

The rioters would soon breach the Rotunda Doors a second time. Below is a screenshot from open-source video[4] with Griswold's head visible in the lower right-hand corner, inside the yellow circle, shortly before the second breach of the doors. As heard in the video, rioters nearby yelled "take the windows out!" and "charge!"

---

[3] See https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec, at 0:46.

[4] See https://youtu.be/Mkm41FMH39g?t=2995, at 50:47.



At around the same time, rioters inside the building found the benches blocking the Rotunda Doors and pulled them away. Three police officers rushed in and blocked the doors, but the numbers of rioters inside East Foyer grew, until the group eventually overwhelmed the officers and pushed through them, opening the doors again, with the aid of flagpoles they shoved into the opening. Alarms blared.[5]   One officer inside the doors recalled at least one person grabbing his helmet, causing him to choke on his chinstrap. Another recalled wondering, "how am I going to make it out of here?"

---

[5]  *See, e.g.,* https://www.youtube.com/watch?v=jBRJmnvFfo8, at 13:13.



*Rioters opening the Rotunda Doors at approximately 2:38 p.m.*

Outside, across the doors from Griswold, another rioter, Derrick Evans, recorded a video, audibly coughing from pepper spray and showing a sea of bodies that yelled and pushed forward toward the door as he joined them.[6]  A reporter from a French news agency, Bangumi, was outside the doors, filming the commotion ("Bangumi video," provided as Exhibit A). After they finished singing the national anthem (which one rioter punctuated by spraying a brown liquid toward officers), rioters began another assault, grabbing at and pushing officers, yelling, "hold the fucking line," "pepper spray 'em!" "let's go!," and "break those windows!"[7]  Rioters also chanted "grab their shields" (after rioters seized one officer's shield),[8] "whose house? Our house!" "who's your

---

[6] See https://www.youtube.com/watch?v=ZZGiAajx6-s at 1:34-2:00.

[7] Bangumi video: 38:25-40:20.

[8] Bangumi video: 39:00-39:20.

president?   Trump!" and "we want Trump!"   Others discussed reports that rioters had made it to the "balcony" (*i.e.,* of the Senate).[9]   They repeatedly sprayed a chemical irritant toward the police guarding the door, who can be seen wiping their eyes as they try to defend the door.[10]

Griswold is first visible in the Bangumi video at timestamp 40:05.



Approximately 35 seconds later (at 40:40), he held up his cell phone, using the camera function.

---

[9]  Bangumi video: 39:45-39:55.

[10]  *See, e.g.,* Bangumi video: 38:40-39:05.



His hand then touched the "record" button, turning it red.[11]



---

[11] Bangumi video: 40:40-40:42.

As heard in the Bangumi video, when the rioters inside the Rotunda Doors forced them open, the crowd outside screamed with excitement. A rioter from inside shoved a yellow Gadsen ("Don't Tread on Me") flag through the doorway. Rioters outside the Capitol began to push their way inside the building. Some yelled, "go!" and "keep that door open!"   Some fought police in the doorway, trying to force them out of the way to clear a path for rioters to enter. Others slightly farther back, including Griswold, drew together and, with their hands on each other's backs, began to push in unison toward the open door frame, yelling "Heave!"[12]   Below is a screenshot from timestamp 41:37:



Griswold navigated his way in the crowd toward a narrow passage through the open doorway, which was partially blocked by a Capitol Police officer. Once he reached the threshold,

---

[12] Bangumi video: 40:55-41:50.

a rioter inside the entrance (wearing a dark-colored beanie) grabbed Griswold and helped pull him inside, past the police, at approximately 2:39:55 p.m.



Within seconds of entering, Griswold climbed on top of one of the benches that had formerly been blocking the Rotunda Doors, as if to get a better view of the scene. He again held up his cell phone, appearing to take pictures or another video.



14

He held his other hand up triumphantly and bounced up and down on the bench with excitement.



He then climbed down, pointed toward the stairs leading up from the East Foyer, and moved toward them, pounding on his chest and talking excitely as he advanced. Photographs published on Getty Images captured Griswold's fervor as he moved toward the stairs that would lead him up from the East Foyer and toward the Senate Chamber:





Climbing the stairs, Griswold repeatedly threw his hands in the air. He hugged a fellow rioter.



Once upstairs, Griswold walked down a hallway. Another defendant, Eric Munchel, followed not far behind, wearing a body-worn camera that recorded the scene ("Munchel video," provided as Exhibit B).   Munchel's video recorded Griswold yelling, "holy shit!   I knew this was going to happen, baby!   I knew it. I motherfucking knew it!" [13]   Griswold knocked on a door as he passed, as if to alert any civilians on other side that the rioters had arrived:[14]

---

[13]  Munchel video: 2:29-2:35.

[14]  Munchel video: 2:36-2:39.



A few seconds later, he yelled, "we're back here for our votes!"[15] And then: "1776 all over again!"[16]

Griswold eventually reached the entrance to the Senate Gallery. As he arrived, rioters and police were scuffling.

---

[15] Munchel video: 2:47-2:50.

[16] Munchel video: 2:55-2:58.



He walked around the confrontation, found a door to the Senate Gallery, and entered the chamber.

In the gallery, overlooking the Senate floor, Griswold responded to the sight of the evacuated chambers by again throwing his arms in the air and yelling, "this is our house now!" Below is a screenshot from another defendant's GoPro video camera, where Griswold is visible facing away from the chamber:



The same defendant also captured Griswold appearing to use his cell phone in the Gallery:



When Griswold was in the gallery, other rioters chanted "Treason!" and "Our house!" Others called out, "anybody home?" "they all left," "they're cowards," "where'd you go?" and speculated that lawmakers had gone into "tunnels."[17]   Griswold filmed a 45-second video that mostly captured the gallery stairs (with rioters yelling "Treason!" and "We did it!" audible in the background), which he later sent to his mother via text message. A screen recording of the video

---

[17] Munchel video: 4:50-5:05.

is provided as Exhibit C.

After leaving the Senate gallery, Griswold encountered a group of police officers guarding a corridor. He stood and listened as other rioters argued with the officers. He returned to the East Foyer and left the Capitol Building through the Rotunda Doors at approximately 2:52 p.m.

Outside the building, on the Capitol steps, Griswold encountered a reporter for the *Post Millennial*, a Canadian online newsmagazine, and gave an interview. The *Post Millennial* posted the interview to social media at 3:34 p.m. Below is a still from the interview:



In the interview, Griswold said:

> We took the building. They couldn't stop us. And now they know we can do it again **and we will fucking do it again**. This is America and we love this country and they are not going to fucking take it again.
>
> Pelosi, Schumer, all you mofos, back off, this is our country, we are willing to do whatever it takes to keep it. Don't mess with us. Back off. This is our country. We showed 'em today. We took it. They ran. And hid.

"LIVE in DC: Protestor speaks to The Post Millennial's Matthew Miller,"

https://twitter.com/tpostmillennial/status/1346918108842369030 (emphasis added) (Exhibit D).

On January 22, 2021, after receiving a tip, the FBI attempted unsuccessfully to contact

Griswold at his home address. That same day, defense counsel contacted the FBI and stated that

Griswold would decline to speak with the FBI.

On March 1, 2021, Griswold was charged by complaint with obstructing an official

proceeding, in violation of 18 U.S.C. § 1512(c)(2), and five misdemeanors (unlawful entry and

disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C.

§§ 1752(a)(1) and (2), and violations of three subsections of 40 U.S.C. § 5104(e)(2)). (Doc. 1).

FBI agents attempted to arrest Griswold on March 3, but he was out of state. His attorney then

made arrangements for him to surrender on March 5. FBI agents warned Griswold not to erase

any data from either of his two cell phones, and Griswold said he understood. On March 5, as

arranged, the FBI arrested Griswold and seized two cell phones, one of which Griswold had on

January 6, and one of which he had purchased since then.

### C.  Evidence Found (and Not Found) on Griswold's Cell Phone

FBI agents searched Griswold's two cell phones pursuant to a warrant. The phone he

acquired after January 6, 2021 had no relevant information. The phone that Griswold had with

him on January 6 did, but also had gaps. The application on the phone that stored videos and

photographs had zero photographs and videos dated between January 4 and 13, 2021. FBI agents

did recover some images from text message strings, but did not find any videos or images that

appeared to be taken outside the Rotunda Doors or in the East Foyer, areas where Griswold is

visible on CCV and other video taking pictures or filming with his cell phone. The only relevant

photos the agents identified from text message strings were from Griswold's longest text

message exchange, which was with his mother, who went to Washington, D.C. and the Capitol

with Griswold. The photographs consist of (1) photographs of Griswold outside the Capitol and

(2) a few photos of paintings inside the Capitol.





Around the same time, Griswold also texted his mother the short video from the Senate Gallery (Exhibit C), which mostly films empty seats; agents recovered that video.

The content of text message strings on Griswold's phone seem to have certain logical gaps. At 2:12 p.m. on January 6, Griswold's mother texted him, "Andrew call me." According to phone records, she then called him 11 times in the next ten minutes. They connected for 24 seconds at 2:21 p.m. At 2:36 p.m., she wrote "the cops are coming." At 3:02 p.m., they spoke for

35 seconds. FBI agents recovered no text messages, and there were no phone calls between them, until Griswold texted her the above-described photographs and video from the Capitol at 5:25 p.m. that day.[18] No text response to these pictures and video from Griswold's mother appears in his phone.[19] The next message Griswold and his mother exchanged was at 6:07 a.m. the following day, when Griswold's mother sent him a *USAToday* link. No response was recovered. Griswold's mother then sent a long message (four cell phone screens' worth) blaming the Capitol Police for instigating the riot and claiming to have rushed at officers.[20] Griswold's phone contains no response to this lengthy, incensed message. The next messages recovered are four YouTube links sent from Griswold's mother at around 6:17 p.m. that evening, twelve hours later.

Griswold's messages with his wife (they were not married at the time, but she will be described as his wife for the sake of brevity) also include gaps in communication around January

---

[18] The images from Griswold's phone included in this sentencing memo are from Central Time, so the photographs were sent at 4:25 p.m. Central, which corresponds to 5:25 p.m. Eastern.

[19] Other exchanges between Griswold and his mother suggest that they were in the habit of responding to material that they shared. For example, on January 9, Griswold texted his mother a post from Parler. About 30 minutes later, she responded, "I'll check it out after dinner sweetie."

[20] In excerpted form, the text message from Griswold's mother stated:

> What you're hearing on tv is a Lie straight outta Hell!   We were in the first wave up the capital steps!   We were peacefully protesting, behind barriers and the Capitol police kept shooting paintballs at us!...I figured the only way to get it stop was rush the Capitol guards! I yelled and told the crowd to "Let's rush the guards!   Well drive them back outta rage!...And the whole crowd went across the wall in a huge wave of people!...We hit the tear gas cloud but the wind was to our backs and the Lord blew the teargas right back on them...Then a group of Antifa guys went through the crowd pushing everyone aside...They all looked like unemployed Crack Heads!   Not dressed as Trump followers...the guards let them thru!?   The Capitol doors had been unlocked!!!...Then on the subway we see the fake news calling us thugs and terrorist!   When all we did was rush them in self defense!!!   They drew first blood!!!!...I was in the front trying to tackle a guard with a grenade launcher!

6, 2021. At 4:01 p.m. on January 6, his wife texted, "call cut out." They then exchanged messages about looking for a certain type of battery for a child's toy. At 4:51 p.m., Griswold wrote, "I don't think I have them." At the same time, they spoke on the phone for a little over one minute. Then, at 5:31 p.m., Griswold's wife wrote "in your camo I love it." Griswold wore a camouflage jacket that day. While the 5:31 p.m. text suggests that Griswold's wife likely was reacting to a photograph that Griswold sent her, wearing his camouflage jacket, the FBI agents were not able to recover any such message from Griswold's phone.

The next morning, Griswold's wife texted him, "I think it should be fine if you didn't break anything or do anything you shouldn't have in there." She also wrote, "It's just a huge deal man, that is the capital building. Like they probably have cameras that scan your face and give your name and address. What were you thinking baby. You could've been hurt or even worse like that one woman. Or in jail." Griswold responded, "We were stopping people from breaking windows and stopping people from vandalizing we walked around hooted and haulered-and left I was in there 12 minutes." His wife wrote, "Meanwhile I'm over here waiting on the swat team."

FBI agents also searched Griswold's phone for text messages with Friend. It found no messages dated before January 21, 2021. On January 22, 2021—the day FBI agents came to his house—Griswold texted Friend, "Call me."

### D.  Indictment, Guilty Plea, and Interview

On July 9, 2021, Griswold was indicted on the same six charges as alleged in the complaint. Doc. 23. On March 30, 2022, pursuant to a plea agreement, he pled guilty to a one-count superseding information, charging him with civil disorder, in violation of 18 U.S.C. § 231(a)(3). Doc. 43 (plea agreement).

On May 25, 2022, Griswold met with the government for an interview, as required by his plea agreement. He acknowledged his conduct on January 6 and provided Friend's name when the government asked. Griswold described the noise, both from the crowd and from flash bangs, and the spray that was in the air. He also stated that, once he entered the Capitol Building, he was looking for an exit, and went upstairs because he thought it might be easier to exit that way than through the doors he had used to enter the building, as they were crowded with rioters.

### III.    STATUTORY PENALTIES

Griswold now faces sentencing on one count of civil disorder, in violation of 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the U.S. Probation Office, Griswold faces up to five years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

### IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The PSR calculates the Sentencing Guidelines applicable to Griswold's offense consistent with the parties' plea agreement. That Guidelines analysis follows:

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | <u>-2</u> |

**Total Adjusted Offense Level:**                                                **8**

Probation calculated Griswold's criminal history as Category I (1 point), which is not disputed. (PSR ¶ 55.)   Accordingly, Griswold's Guidelines imprisonment range is 0 to 6 months.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this felony case, sentencing is also guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of the recommended term of incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the

Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at Griswold's individual conduct, the Court should assess that conduct on a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

To be clear, had Griswold personally engaged in violence or destruction, he would be facing additional charges and/or heightened exposure under the Sentencing Guidelines. The absence of violent or destructive acts directly committed by Griswold is therefore not a mitigating factor in this case when comparing his case to others being sentenced for the same offense under the same guidelines.

The nature and circumstances of Griswold's crime favor a lengthy term of incarceration. Griswold's statement on the Capitol steps could not make his intent to disrupt the peaceful transfer of power clearer: he relished having forced the evacuation of Congress (naming two members by

name), of the momentary triumph of his version of "our country" over the actual democratic will of its citizens. Griswold also celebrated the human suffering of the riot—taunting members of Congress who "ran and hid" and the outnumbered police who "couldn't stop us." He bragged not just about obtaining his desired outcome (for the moment), but having done so illegally, by literally chasing away the people's elected representatives. Then he vowed to do it all over again. His threat shows an absolute disregard for the rule of law.

Griswold has sought to frame his statement as akin to an immature schoolyard taunt, as a bunch of hooting and hollering. No doubt, emotions ran high; Griswold was visibly exuberant inside the Capitol. But the defendant, a 34-year-old father of five, made this statement after forcing his way into the Capitol as part of a violent mob, past police being assaulted, and progressed all the way to the building's inner sanctum, where he yelled in jubilation after seeing the now-empty chamber.

Nor were his actions as impulsive as he suggests. He traveled all the way from Florida to Washington, D.C., motivated to attend the first political rally of his life. After the rally, he did not go straight to the Capitol, but stopped off in his hotel room, considered how law enforcement might view the flag he had been carrying, and decided to leave it behind, lest it make him a target. On Capitol grounds, again by his own admission, he witnessed a flash-bang explode and then made his way around to the other side of the building. At each of these moments, he had an opportunity to decide what he wanted to do. And, at each inflection point, he chose to play a more serious role in disrupting the peaceful transfer of power. In this context—the context of the riot and of Griswold's own actions within it—his violent, threatening language cannot be dismissed as empty rhetoric. At a minimum, it proves that Griswold was no tourist, and that his purpose was to obstruct

Congress (or worse), demonstrating the seriousness of the offense. It also belies his attempt to depict himself as a reluctant participant in the riot, pulled into the Capitol Building and then focused on finding a way out. There is nothing remotely reluctant about what Griswold said.

Griswold's statement is not the only aggravating factor. He forced his way into the Capitol, joining a crowd pushing past the police and yelling "heave!"   He did so immediately after people nearby sprayed and otherwise assaulted officers at the Rotunda Doors, and he acknowledged that he was only in the area in the first place because he had seen flash bangs on the other side of the building and made his way around.

Griswold's conduct inside the Capitol also weighs in favor of a sentence of incarceration. Just moments after witnessing officers being assaulted, he celebrated what he appeared to see as a victory, thrusting his hands in the air and hugging another rioter. He yelled "1776 all over again!" and "we're back here for our votes," further evidence that his purpose that day was to disrupt the certification of the election.

And then, he made it all the way to the Senate Gallery. Griswold's presence there is another aggravating factor. In the words of a Capitol police officer pleading with rioters to leave the Senate Chamber that day, it is the "the sacredest place."[21] The inner sanctum. The House and Senate chambers are where Congress was to debate objections and verify the results of the 2020 Presidential election. They are where Congress undertakes its most official duties, holds its largest debates, takes its final votes. They are also visible, recognizable symbols of democracy at work. They are not immediately accessible from an exterior entrance; any defendant who breached the

---

[21] Luke Mogelson, *A Reporter's Footage from Inside the Capitol Siege,* The New Yorker, *available at* https://www.youtube.com/watch?v=270F8s5TEKY, at 6:45-6:50.

Senate Chamber or Gallery had to spend more than minimal time inside the Capitol and travel some distance through the building. The fact that Griswold reached the Senate should eliminate any doubt that he was mistaken about whether he was allowed to trespass or—in Griswold's case— that he was simply looking for an exit.

Relatedly, Griswold's entry into the Senate Gallery places him in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda, because it means that he took the extra step to occupy the Capitol and displace Congress, displaying the dominance of the mob. For that reason as well, his presence in the Senate Gallery is even more disruptive than the average rioter's breach. Physically occupying the Senate Gallery poses a greater threat and creates a greater impediment to members of Congress just trying to do their jobs than would a trespasser passing through a central hallway.

A further aggravating factor is that Griswold appears to have deleted evidence from his cell phone. The Bangumi video actually shows Griswold pressing the record button to film a video outside the Rotunda Doors. Inside the doors, he is unmistakably taking photos or videos on his cell phone, as seen on Capitol CCV. Yet the photo application on his phone was empty of January 6 photos and videos, and the few videos and photographs the FBI did recover were a few shots and a short video embedded within his longest text message string, with his mother.

As described above, Griswold's text messages also seem to contain gaps suggesting evidence deletion. For example, on January 6, his wife texted him, "in your camo I love it" (he wore a camouflage jacket to storm the Capitol), but the preceding text, from a few hours earlier, concerns batteries for a children's toy. It seems likely that Griswold sent her a photo or video of himself that day, and then thought better and deleted it. The FBI recovered no text messages with

Friend with whom he traveled to D.C. (and who entered the Capitol with Griswold) until January 21, when the FBI contacted Griswold and Griswold texted Friend, "call me." And FBI agents did not recover any response from Griswold's mother to any of the January 6 photos or video, or from Griswold to the long account of January 6 that his mother shared.

Griswold was aware of a possible investigation early. The day after January 6, his text message exchange with his wife reflects concern that he might he caught. Griswold told his wife that he was "stressed," and she said that "it's a huge deal man, that is the capital building." She continued, "they probably have cameras that scan your face and give your name and address." She warned him that he could end up in jail and said that she was waiting for the SWAT team. After the FBI contacted Griswold on January 22, he texted Friend "call me," and declined to speak with the FBI.

The FBI was not able, through forensic analysis of Griswold's phone, to identify deleted items. And there could be innocent reasons why the FBI agents did not find some of the data they expected. Taken together, though, all of the indicators—the lack of video or photo in the photos application on the phone, the clear evidence of Griswold taking photo and video outside and inside the Rotunda Doors, the gaps in text messages—suggest that Griswold deleted evidence of his crimes from his cell phone. By January 6, Griswold was "stressed" and knew he could face scrutiny for what he did, providing a motive to do so. This additional culpable conduct supports the requested term of incarceration.

## B.  Griswold's History and Characteristics

### Griswold's Minimization of the Offense

Griswold's text messages to his wife indicate that Griswold immediately began to

minimize and mischaracterize his conduct. On January 7, 2021, he told her, "We were stopping people from breaking windows and stopping people from vandalizing we walked around hooted and haulered-and left I was in there 12 minutes." While Griswold indisputably did hoot and holler, and was in the building for approximately 12 minutes, the government is not aware of any evidence that Griswold took action to stop the destruction of property; it would be an unusual combination to oppose vandalism but praise terrorizing elected officials, as Griswold did.

The expressions of contrition in defendant's letter to probation are also not significantly mitigating. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). The government notes that it can be difficult to measure the sincerity of expressions of contrition of a defendant facing sentencing. *See* Notice of Defendant's Post-Sentencing Statements, *United States v. Evans*, No. 21-cr-337 (RCL), Doc. 52 (D.D.C. June 30, 2022) (describing January 6 defendant who expressed remorse at sentencing and made contradictory statements in radio appearance the day after).

While Griswold's letter expressed remorse and apologized to Congress and the police, he continued to make excuses. PSR ¶ 35. Griswold claimed that "a flash bang or tear gas landed ten feet away to my right so I ran the other direction which led me closer toward the steps leading up to the door I eventually ended up going through." *Id.* But a flash bang did not force Griswold *up* the Capitol steps all the way to the Rotunda Doors. Nor did it force Griswold to push his way

through once the doors opened. Griswold claimed he got "caught up in the moment," but, as noted above, he returned to his hotel room after the rally, put on a heavier jacket, and left his flag— suggesting both that he knew a confrontation was possible (thus the concern about carrying an object that could be perceived as a weapon), and that he had time to reflect before choosing to proceed to the Capitol. Once he was at the Capitol and saw resistance to the rioters on one side, he made the effort to go around the building and breach it on the other side. These actions do not suggest a momentary lapse in judgment, but rather a more conscious and concerted effort to enter the building.

Griswold's letter to Probation also minimized his entry into the Capitol building and his actions once inside. He claimed that, once he entered the Capitol, he was looking for a way out. He made the same assertion in his post plea-debrief with the government. The video evidence undermines this claim. It does not make sense that Griswold, if looking for an exit, would climb a set of stairs leading up from the East Foyer (where he entered), as he did. Griswold had already climbed stairs to reach the Rotunda Doors; he would have seen that the way out of the building were on the same level where he entered, or lower. When Griswold was inside the Capitol, moreover, he (1) posed for pictures in front of paintings; (2) yelled "I knew this was going to happen, baby!   I knew it. I motherfucking knew it!"; "we're back here for our votes," and "1776!"; (3) pumped his fists in the air; (4) hugged a rioter; (5) threw his arms in the air; and (6) entered the Senate Gallery. None of these are the actions of an individual in search of an exit, or of someone who was "lost and looking" for an exit, as Griswold told Probation. PSR ¶ 35.

Griswold's claim about what he was doing in the Senate Gallery is also suspect. He told Probation, "I spent time in the gallery looking at the amazing finish carpentry that was done in this

area . . . this is the reason I stayed in there looking around at the Chamber from the gallery." PSR ¶ 35. While the government does not have video of Griswold's entire time inside the Senate Gallery, the video it does have shows Griswold looking *away* from the chamber, as he yells, "this is our house now!" From this video, it is apparent that admiring the fixtures was not "*the* reason" he was in the Senate gallery (emphasis supplied).[22] PSR ¶ 35. While Griswold may have also enjoyed the impressive design flourishes of the chamber, it was at best disingenuous not to acknowledge that he celebrated the rioters' forceful power-grab while he was in the Senate ("this is our house now!). This was no quiet student of architecture.

Griswold's description of his entrance to the Capitol also minimizes his responsibility. He stated, "[w]hen people got to the door several of us tried to move back but we were at that point of being swept in with the crowd and being physically pulled in by a man that was already inside." PSR ¶ 35. Griswold thus suggested that he did not want to enter the building at all. Even if another rioter helped Griswold advance those last few feet to enter the building, Griswold ignores how he got there in the first place: he joined the group pushing toward the doors—and did so only after crossing into the restricted area and advancing up the steps to the door. The video does show a rioter pulling Griswold the final few feet in the building but does not indicate any reluctance on Griswold's part.

### Griswold's Criminal History

As for criminal history, Griswold had six criminal convictions in early adulthood, and has one criminal history point from a 2016 DUI, for which he was sentenced to probation (and then arrested on a probation violation and re-sentenced to further probation). PSR ¶ 54. Being on

---

[22] The short video defendant filmed in the gallery is also angled away from the Senate chamber.

probation as recently as 2018, and then being arrested for violating probation, was not sufficient to deter Griswold from committing a crime on January 6, weighing in favor of a term of incarceration this time.

Griswold has steady employment doing construction work and has five children, three of whom live with him. PSR ¶¶ 83-85, 119-123. Griswold's family is understandably concerned about the loss of financial support while he is incarcerated. As Griswold's wife told him on January 7, it showed incredibly poor judgment for him to do what he did on January 6, knowing that he has five children to support. The government acknowledges the difficulties that the defendant's criminal conviction have posed. At the same time, the defendant repeatedly chose to participate in a violent mob that assaulted police and gloated about the people's elected representatives having to run and hide.

The PSR also includes several positive characterizations of Griswold offered by his wife and his mother. PSR ¶ 91. The government notes that Griswold's mother marched to the Capitol with him and sent a message about inspiring a crowd to rush the Capitol Police on January 6. Her desire to defend her son in this case should be understood in this context.

## C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[23] As with the nature and circumstances of the offense,

---

[23] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's

this factor supports a sentence of incarceration. When Griswold entered the Capitol grounds, and then the Capitol itself, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day by people such as Griswold, who found reason to celebrate the attack. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that interfering with police during a civil disorder and contributing to the obstruction of Congress is not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.       The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[24] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated by many

---

Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf
[24] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, although Griswold is in Criminal History Category I, he was on probation less than three years before he committed the instant offense and has had his probation revoked, neither of which was enough to deter him here. Second, Griswold's acceptance of responsibility and remorse is undermined by the excuses he continues to

offer for his behavior. As described above in Section V(B), Griswold has minimized and offered excuses for his conduct, even in his letter to Probation, where he claimed to do the opposite. The Court should impose a substantial sentence to impress upon Griswold the wrongfulness of what he did to deter him from engaging in similar conduct in the future. If Griswold truly believes that he was pulled inside the building and then was just trying to get out (except for when he was admiring the place), or that the criminal episode was just a moment where he got carried away, it is difficult to see how he has drawn lessons from this episode that will lead him to conform his future behavior to the law.

Griswold's statements at the Capitol are also alarming. When he was inside the building, he yelled "1776!" seeing himself as playing a role in a revolution. On the Capitol steps, in an interview—a statement meant for public consumption—Griswold warned, "We took the building. They couldn't stop us. And now they know we can do it again **and we will fucking do it again**" (emphasis added). Taking Griswold at his word, he therefore poses an ongoing threat.

E.      **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with

appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.       Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Griswold and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other cases; to try to mechanically compare Griswold to other civil disorder defendants prior to January 6, 2021, would be a disservice to the magnitude of what the Capitol riot entailed and signified.

A small number of defendants convicted of a single count of 18 U.S.C. § 231(a)(3) on January 6, 2021, have now been sentenced. Most recently, on June 22, former West Virginia legislator Derrick Evans was sentenced to three months' incarceration. *United States v. Evans,* 21-cr-337 (RCL). Like Griswold, Evans was one of the rioters outside the Rotunda Doors who pushed his way inside the building; both men entered at approximately 2:40 p.m. Evans's status as an elected representative on January 6 was a significant aggravating factor. Evans also made some statements on a livestream similar to Griswold's, such as "The cops are running!" and "The revolution has started," although he did not threaten to "do it again," and he did not celebrate members of Congress having to hide from a violent mob. Unlike Griswold, however, Evans stayed inside the Capitol for only ten minutes and did not enter any sensitive spaces, let alone the Senate—he walked to the Rotunda and Statuary Hall and then left through the same doors through which he entered, at 2:50. Nor did the government suspect Evans of destroying evidence and, at sentencing, the government credited Evans' contrition (although, as noted above, Evans proceeded to appear on the radio the day after sentencing and made several contrary statements).

This Court may also consider the year-and-a-day sentence imposed on Nolan Cooke, 22-cr-52 (RCL). Cooke, like Griswold, pleaded guilty to a single count of violating 18 U.S.C.

§ 231(a)(3). Like Griswold, Cooke was a member of the mob fighting police at the Rotunda Doors. Cooke, however, did not enter the Capitol building, let alone reach the Senate gallery—which mitigates the nature and circumstances of his offense. Whereas Griswold deleted evidence from his phone, Cooke admitted to recording events on his GoPro and directed agents to the flash drive where his recordings were saved. He did, however, more directly engage with law enforcement officials both at the bike rack barriers and near the Rotunda Doors, subjecting him to an additional three points for "physical contact" under the Sentencing Guidelines. See U.S.S.G. 2A2.4(b)(1)(A). Thus, Cooke faced a higher Guidelines range—8-14 months as opposed to Griswold's 0-6 months. He also was one of the first rioters to break through the police line on the east side of the building and incited other rioters to "get" officers and break through barriers, which is more serious than Griswold's statements celebrating the rioters' actions immediately after the fact.

Daniel and Daryl Johnson, 21-cr-407 (DLF), also participated in the breach of the Rotunda Doors (albeit from the inside) and were sentenced for violating 18 U.S.C. § 231(a)(3); they were sentenced to four months' and one month incarceration, respectively. Between the two, Daniel had more criminal history than Daryl; Judge Friedrich credited Daryl's exemplary record (which included thousands of hours of community service) and noted that she would likely have otherwise sentenced him to a longer prison term. Unlike Griswold, the Johnsons did not breach the Senate Chamber, did not delete evidence, and did not celebrate in a media interview.

Here, the government has recommended a sentence within the Guidelines range. So long as "the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). This is because "the Sentencing

Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[25] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The government has not identified officers who suffered injury as a result of Griswold's interference. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Griswold must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Griswold played in the riot on January 6.[26] Plea Agreement

---

[25] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[26] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Griswold's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

## VII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of five months, within the guidelines range agreed upon by the parties in the plea agreement, three years' supervised release, restitution of $2,000, no fine, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  *   /s/ Alexis J. Loeb                    *
ALEXIS J. LOEB
CA Bar No. 269895
Assistant United States Attorney
(Detailed to USAO-DC)
U.S. Attorney's Office
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
Office: 202-415-7200
Alexis.Loeb@usdoj.gov