```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                 Plaintiff,           1:21-cr-00459-CRC
                                        Wednesday, July 13, 2022
 5    vs.                               2:05 p.m.

 6    ANDREW WILLIAM GRISWOLD,

 7                 Defendant.
      - - - - - - - - - - - - - - - x
 8

 9    _____

10               TRANSCRIPT OF SENTENCING HEARING
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE
      _____
12    APPEARANCES:

13

14    For the United States:        ALEXIS JANE LOEB, ESQ.
                                     U.S. ATTORNEY'S OFFICE FOR
15                                   THE NORTHERN DISTRICT OF CAL
                                     450 Golden Gate Ave, 11th Fl.
16                                   San Francisco, CA 94102
                                     (415) 436-7168
17                                   alexis.loeb@usdoj.gov

18    For the Defendant:            CHRISTOPHER KLOTZ, ESQ.
                                     STEVENSON KLOTZ, LLP
19                                   510 East Zaragosa Street
                                     Pensacola, FL 32502
20                                   (850) 444-0000
                                     chris@stevensonklotz.com
21

22    Court Reporter:               Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
23                                   U.S. Courthouse, Room 6718
                                     333 Constitution Avenue, NW
24                                   Washington, DC  20001
                                     (202) 354-3187
25
```

1                              I N D E X

2

3    <u>WITNESS</u>                                              <u>PAGE</u>

4    ANDREW WILLIAM GRISWOLD
          (By Mr. Klotz).................................... 18
          (By Ms. Loeb).................................... 26
5         (By Mr. Klotz).................................... 32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're on the
 3    record for Criminal Case 21-459, United States of America
 4    vs. Andrew William Griswold.
 5              Counsel, please approach the lectern and identify
 6    yourselves for the record starting with the government.
 7              MS. LOEB:  Good afternoon, Your Honor; Alexis Loeb
 8    for the United States.
 9              THE COURT:  Good afternoon, Ms. Loeb.  Good to see
10    you in person.
11              MS. LOEB:  Thank you.  You, too.
12              MR. KLOTZ:  Good afternoon, Judge; Chris Klotz for
13    Mr. Griswold.
14              THE COURT:  Okay.  Mr. Klotz, good to meet you as
15    well.
16              MR. KLOTZ:  Thank you, sir.  And do you want
17    Mr. Griswold to come?
18              THE COURT:  Mr. Griswold, how are you feeling
19    today?
20              THE DEFENDANT:  As good as I can be.
21              THE COURT:  Okay.  Very well.  And you can have a
22    seat.
23              THE DEFENDANT:  All right.  Thank you.
24              THE COURT:  All right.  I would also note at the
25    outset that we are joined by these fine ladies and gentlemen
```

1    who are members of the St. Albans School of Public Service

2    summer program, and they are seeing their government in

3    action this summer as interns in Washington.

4              All right.  Are we ready to proceed?

5              MR. KLOTZ:  Yes, Your Honor.

6              THE COURT:  All right.  The Court has read the

7    documents that have been submitted, the presentence

8    investigation report -- and we have Ms. Reichler -- the

9    memos from both the government and the defense in aid of

10   sentencing, including the defendant's statement to the

11   Court.  I've reviewed various of the videos that have been

12   referenced in memoranda and submitted to the Court.

13             Any members of the family here?  Any other guests,

14   Mr. Klotz?

15             MR. KLOTZ:  Yes, Your Honor.

16             THE COURT:  Who do we have?

17             MR. KLOTZ:  Mr. Griswold has his mom and his wife

18   and a family friend that had to come up from Florida.

19             THE COURT:  Okay.  Welcome, folks.

20             I've also reviewed a number of letters of support

21   filed on Mr. Griswold's behalf, including from his mother,

22   his father, his employers, and numerous friends and

23   neighbors.

24             Why don't we start with the factual findings in

25   the presentence investigation report.  There was one defense

1    objection to Paragraph 54 regarding a probation violation

2    for a prior conviction in Santa Rosa County.  The probation

3    office did not change the presentence report, but the

4    objection is noted for the record.

5             Other than that, any other objections just to the

6    factual findings?

7             MR. KLOTZ:  No, sir.

8             THE COURT:  Ms. Loeb?

9             MS. LOEB:  No, Your Honor.

10            THE COURT:  All right.  Mr. Griswold, has

11   Mr. Klotz reviewed the presentence investigation report with

12   you?

13            THE DEFENDANT:  Yes, sir, Your Honor.

14            THE COURT:  And have you been satisfied with his

15   services in the case?

16            THE DEFENDANT:  Yes, sir.

17            THE COURT:  All right.

18            Okay.  Hearing no other objections, the Court will

19   accept the factual findings in the presentence investigation

20   report regarding the circumstances of the offense; and,

21   therefore, those facts, as stated in the PSR, will be

22   adopted by the Court for purposes of sentencing.

23            Calculating the advisory sentencing guidelines

24   range, Mr. Griswold pled guilty to one count -- one felony

25   count of civil disorder in violation of 18 USC Section

1      231(a)(3).  That carries a statutory maximum of five years

2      in prison, supervised release of one to three years, and up

3      to a $250,000 fine and a $100 special assessment.

4              The presentence investigation report calculates

5      the guidelines range at a base offense level of 10.  There

6      were no specific offense enhancements, but there was a

7      reduction of two levels for acceptance of responsibility

8      leading to a total offense level of 8.

9              In terms of criminal history, Mr. Griswold has

10     eight adult criminal convictions, mostly traffic or

11     relatively minor drug possession convictions, leading only

12     to one point for a 2016 DUI conviction in Okaloosa County,

13     Florida.  That places him in Criminal History Category 1.

14             Offense Level 8 at Criminal History Category 1

15     results in an advisory sentencing guidelines range of zero

16     to six months.  In addition, pursuant to his plea agreement,

17     Mr. Griswold has agreed to pay restitution in the amount of

18     $2,000 to the Architect of the Capitol.

19             Any objections for the record to the guidelines

20     calculation?

21             MR. KLOTZ:  No, sir.

22             MS. LOEB:  No, Your Honor.

23             THE COURT:  All right.  The probation office has

24     submitted a recommendation of 60 days incarceration, one

25     year of supervised release, and the $2,000 in restitution as

```
 1    agreed plus an additional $2,000 fine.
 2              The government has recommended five months
 3    incarceration, three years of supervised release, and the
 4    restitution.
 5              Ms. Loeb, do you want to address the sentencing
 6    factors?
 7              MS. LOEB:  Yes, Your Honor.  Thank you.
 8              Is it okay with the Court if I remove my mask?
 9              THE COURT:  You may.  I'm sorry, I should have
10    mentioned that.  Feel free to remove your mask, if you're
11    addressing the Court.
12              MS. LOEB:  Mr. Griswold told probation, quote, I
13    thought I was doing the right thing to stand up and speak
14    out against a rigged election.
15              I'd like to take a little bit of a closer look at
16    Mr. Griswold's entry into the Capitol to examine what that
17    exactly involved.  So first I have a short clip, less than
18    three minutes, from the -- from Exhibit A, which was a video
19    received from a French news agency via MLAT.  And in the
20    first 30 seconds of the video, which is outside the Rotunda
21    doors, we will see rioters throwing things at police.  We'll
22    see the first of many times where they spray at police and,
23    of course, chanting and yelling.
24              (Video playing)
25              MS. LOEB:  We see more spraying right there.
```

1              (Video playing)

2              MS. LOEB:  We continue to see spraying, and the

3      officers by the door, you can see them crouching over.  Some

4      are covering their eyes.  One of these is the officer who

5      later told the FBI he didn't know if he would make it home

6      that day.

7              (Video playing)

8              MS. LOEB:  And now we just heard the chants of

9      "take their shields" as a shield, a riot shield stolen from

10     the Capitol Police, was passed through the crowd.

11             (Video playing)

12             MS. LOEB:  In about 20 seconds we'll see

13     Mr. Griswold in the lower right-hand corner of the frame.

14             (Video playing)

15             MS. LOEB:  In the upper right-hand corner of the

16     frame here you can see Mr. Griswold's profile, very close to

17     where this video is being taken.

18             (Video playing)

19             MS. LOEB:  And here we see Mr. Griswold holding up

20     his hands with his cell phone, and in just a second you'll

21     see him press the red button to record a video, a video that

22     the government never recovered from Mr. Griswold's cell

23     phone.

24             (Video playing)

25             MS. LOEB:  Now, in about ten seconds rioters on

1     the inside will force the doors open, and you will hear the

2     crowd react.

3               (Video playing)

4               MS. LOEB:  This is the moment where the doors

5     open, and there you see Mr. Griswold on the bottom.  More

6     rioters are spraying toward the police, and you begin to see

7     Mr. Griswold here up against the crowd of people.

8               I don't know that you'll hear this on this audio,

9     but the rioters have started yelling "heave, heave," and the

10    camera kind of stays put here, but you'll see Mr. Griswold

11    is with the group that begins to surge forward.

12              (Video playing)

13              MS. LOEB:  Mr. Griswold there has taken out his

14    cell phone, and then he's put it away again holding onto the

15    rioter in front of him.

16              (Video playing)

17              MS. LOEB:  Now you hear the shouts of "heave" as

18    the group pushes forward past the police through the open

19    door that would lead to the Capitol.

20              Mr. Griswold told probation that he was trapped in

21    a group of people and that we all started being moved from

22    behind toward the door, but the person filming this footage

23    who was right behind Mr. Griswold, that person isn't being

24    pushed toward the door.

25              What we've seen -- and Mr. Griswold, during all of

1   this, was able to take a little break and take out his cell

2   phone before rejoining the mob and pushing forward.  I think

3   this is another example of Mr. Griswold minimizing his

4   conduct, of saying he's not offering excuses but then doing

5   just that.  Mr. Griswold joined the group to push forward

6   past the police and into the Capitol.

7          Now I'd like to look at a short clip of what was

8   going on inside the Capitol right before the door was opened

9   and then once Mr. Griswold entered.  And there is no sound

10  with this video.

11         (Video playing)

12         MS. LOEB:  There are a couple of police up against

13  the door, and you'll see the rioters moving forward so that

14  they basically overpower the police and push the doors open,

15  and then they jammed the flags through the door, too.

16         So here we have the doors starting to open, and

17  now the doors are opening.  This is when the rioters outside

18  are yelling.  And now I'd like to point out this man in the

19  orange sweatshirt who pulls the chin strap of a Capitol

20  Police officer, choking him.

21         (Video playing)

22         MS. LOEB:  There he has his hand on the officer's

23  helmet.

24         And next we'll see a Capitol Police officer

25  entering and moving off to the side who is very clearly

1    struggling.  Here he is, staggering off to the side holding

2    his mouth.

3              Now you'll see the crowd from outside beginning to

4    surge forward toward the door.

5              (Video playing)

6         MS. LOEB:  And to move inside the Capitol they

7    have to get past some police who are still blocking part of

8    the open doorway.

9              And just now there is a man with a black beanie

10   entering who stands by the door.  You see he's just pulled

11   one rioter in, and then you'll see Mr. Griswold is kind of

12   clawing his way along the door up here, and it's really just

13   when he gets to the threshold you'll see him grab the hand

14   of the man with the black beanie.

15             (Video playing)

16        MS. LOEB:  Here's comes Mr. Griswold.  He's moved

17   his way in.  He's at the doorway.

18             And now, once he's really inside, the man with the

19   black hat has grabbed him.  You can see Mr. Griswold is

20   talking.  His cell phone is out.  He gets up on the bench,

21   puts his hand in the air.  Here he looks like he is taking a

22   photograph or possibly filming a video, which the FBI did

23   not recover from his phone, and then he moves toward the

24   stairs.  His mouth is pretty much in constant motion

25   pointing towards the stairs.

```
 1                    (Video playing)
 2              MS. LOEB:  And then I have a very short clip of
 3      Mr. Griswold going up the stairs.
 4                    (Video playing)
 5              MS. LOEB:  There he is with his arms in the air.
 6      He's hugging another rioter, pointing, appears to be
 7      talking.  His arm's in the air again.
 8              This is not someone who was trapped, who got
 9      pushed in the building against his will, who was then
10      looking for a way out.  Mr. Griswold said that when
11      people got to the door several of us tried to move back,
12      but we were at that point being swept in with the crowd,
13      and I was physically pulled in by a man who was already
14      inside.  The video completely undermines that this is what
15      happened.
16              So, Mr. Griswold, in the course of entering the
17      Capitol, has seen people spraying the police multiple times.
18      He's seen -- he's heard people yelling to steal their
19      shields.  He's been close to where a riot shield of the
20      Capitol Police actually was stolen, and then he pushed
21      forward.
22              And once inside he was exuberant.  He was hugging
23      people, shouting, taking videos.  He showed no sign of
24      remorse then for anyone who was getting hurt.
25              Who could even think at the time that what we just
```

1    saw was speaking out and standing up doing the right thing?

2    It clearly wasn't at the time, and that's only become even

3    more true as time has passed.

4          But this is the defendant's judgment.  This is how

5    the defendant reacted to people getting sprayed -- to police

6    getting sprayed and pushed aside and having their riot

7    shields stolen.  This is how the defendant reacted to

8    members of our government being forced to, in his own words,

9    run and hide and to democracy grinding to a halt.

10         The defendant celebrated, and then he gave an

11   interview where he threatened to do it again.  The defendant

12   calls that interview just an impassioned moment, that he got

13   caught up a bit.  The government disagrees.

14         His interview is not just one split second when

15   he's out of control.  It's part of a whole course of

16   conduct.  Mr. Griswold has had time to think about what's

17   going on.  He traveled all the way from Florida.  He

18   listened to speeches, and then he went back to his hotel

19   room.

20         And he knew there might be a conflict, and so he

21   put his flagpole down so that no one would perceive him as

22   having a weapon, and then he went to the Capitol.  And when

23   he heard flash bangs on one side, he went around to the

24   other side, and he went up to the door, and he pushed his

25   way in.

1    Once he got into the building, he went upstairs.

2    He made it all the way to the United States Senate Chamber,

3    and then he went outside the building, and he gave that

4    interview.

5    And then, after that, he realized that he might

6    get in trouble, and so what did he do next?  He didn't turn

7    himself in.  He didn't express remorse.  He tried to delete

8    evidence of his crime.

9    This is a course of conduct, Your Honor, that

10   lasted much longer than a moment, and the interview and

11   Mr. Griswold's words are completely in line with what we saw

12   from Mr. Griswold on January 6th.

13   But even if the interview was a momentary lapse,

14   it is still a cause for deep concern.  I know we've quoted

15   it in the sentencing memo, but I just think it's so

16   important to watch it, and so I'd like to show it.

17        (Video playing)

18        MS. LOEB:  "They ran and hid."  The defendant here

19   is not just celebrating the stopping of the certification.

20   He's specifically gloating about members of Congress having

21   to run and hide.

22        Who are they?  Well, they're people.  Getting

23   ready for today I looked up a few facts about the 117th

24   Congress, and I learned the following:  It included 151

25   women, 113 people who had worked in education, 16

1    physicians, two psychologists, an optometrist, two

2    pharmacists, and three nurses.  There were seven ordained

3    ministers.  There were 27 farmers, ranchers, or cattle farm

4    owners.  There was one flight attendant, four pilots, and

5    one astronaut.  There were protestants, Catholics, Jews,

6    Hindus, Buddhists, Muslims, and, of course, Republicans and

7    Democrats.

8             These are people.  These are over 500 people, not

9    to mention all their staff members, and the defendant is

10   celebrating that they had to run and hide in fear for their

11   lives, and he's threatening to do it again.

12            Mr. Griswold's sentencing memo asks the Court to

13   consider the economic cost that his family will bear if he

14   is incarcerated.  On January 6th, though, Mr. Griswold acted

15   without concern for these 500 people who had to evacuate the

16   Congress, and all of the police who were injured that day,

17   and all of the staff members who were victims, too.  He

18   celebrated what happened, and he wasn't thinking about the

19   potential consequences for his own family either.  He showed

20   the opposite of concern for others.

21            And even beyond the human cost, of course, is the

22   fact that Mr. Griswold here is celebrating having disrupted

23   the peaceful transfer of power that has set our country

24   apart since its founding.  It's extremely serious, and it

25   requires specific deterrence.  Mr. Griswold's conduct,

1    pushing his way into the building, making it all the way to

2    the Senate Chamber, threatening to do it again, and then

3    deleting evidence is worthy of a substantial sentence of

4    incarceration from the Court.

5             Thank you.

6             THE COURT:  Okay.  One question, he traveled with

7    a friend and his mother; is that correct?

8             MS. LOEB:  Yes, and his brother.

9             THE COURT:  And his brother.  And did they

10   participate, and have they been charged?

11            MS. LOEB:  They have not -- they have not been

12   charged, Your Honor, and I don't want to go into the details

13   of a pending investigation.

14            THE COURT:  Understood.  I want to know whether

15   there are any, you know --

16            MS. LOEB:  There are no co-defendants.

17            THE COURT:  -- exemplars or co-defendants or other

18   folks who were with him that have been in our court.

19            No.  Okay.

20            MS. LOEB:  Thank you.

21            THE COURT:  Mr. Klotz.

22            MR. KLOTZ:  Your Honor, I'd like to call a

23   witness, if I may?

24            THE COURT:  Go ahead.  Approach the lectern.

25            MR. KLOTZ:  Yes, sir, Your Honor.  Your Honor --

```
1              THE COURT:  You don't need to call her to the

2    stand.  If someone wants to address the Court from his

3    family, I'm happy to hear from them.

4              MR. KLOTZ:  Judge, Mr. Griswold actually wanted

5    to --

6              THE COURT:  I always invite the defendant to

7    address the Court, if he wishes, okay?

8              MR. KLOTZ:  Judge, I had some factual questions to

9    ask him about that would probably be more than just an

10   allocution.  That would actually be about factual issues

11   that are raised in the sentencing memo from the government

12   that I wanted to have direct testimony from, if that would

13   be appropriate?

14             THE COURT:  Very well.

15             Mr. Griswold.

16             Well, if you're going to question him, I'm going

17   to put him under oath.

18             MR. KLOTZ:  Yes, sir, Your Honor.  And I've

19   advised him if we engaged in this process that he would be

20   subject to cross-examination.  He understands.

21             THE COURT:  Very well.  This is not a typical

22   procedure at a sentencing colloquy, but we'll allow it.

23             MR. KLOTZ:  Understood.

24             THE COURT:  Mr. Griswold, step right up.  And

25   please remain standing and raise your right hand.
```

ANDREW WILLIAM GRISWOLD, Sworn

DIRECT EXAMINATION

BY MR. KLOTZ:

Q.  Can you tell us your name, please.

A.  Yes, Andrew William Griswold.

Q.  And you are the defendant in this case; is that correct?

A.  Yes, sir.

Q.  I want to ask you a couple of specific questions about things that Ms. Loeb just discussed that were also presented in the sentencing memorandum from the U.S. Attorney's Office.  You're familiar with that document, correct?

A.  Yes, sir.

Q.  Okay.

MR. KLOTZ:  I'm going to show you what's on Page 12, Your Honor, of the government's sentencing memorandum. And I apologize.  I have a black-and-white copy.  I do not have a color copy with me.

Q.  Mr. Griswold, do you recognize this photograph as something that you have seen in the government's sentencing memorandum?

A.  Yes, sir.

Q.  And in some of the discovery that we've had in this case?

A.  Yes, sir.

Q.  Can you -- and whose camera is that where there's an

1    arrow pointing to it?

2    A.  That's mine, my phone camera.

3    Q.  Are you able to tell by looking at that picture what

4    application is running at the time on the --

5    A.  Yes, it's Snapchat.

6             THE DEFENDANT:  Oh, I'm sorry.

7    Q.  Yes, so you and I can't speak over one another so just

8    wait until I finish.

9             Are you able to tell what application is running

10   on your phone in this particular picture?

11   A.  Yes, sir.

12   Q.  And how are you able to tell what application is running

13   on your phone in this picture?

14   A.  I can see some of my friends in the top left corner from

15   the Snapchat.

16   Q.  So that indicates to you that you had the application

17   Snapchat running at the time; is that correct?

18   A.  Correct.

19   Q.  And is this the application through which you took a

20   video on that day?

21   A.  Yes, sir.

22   Q.  What happens to Snapchat videos after you snap them?

23            I don't know the complete terminology.  My

24   children would know better than me.  But what happens with

25   the video once you capture the video in the program

1    Snapchat?

2    A.  I post it I believe it's for 24 hours or until 12:00

3    that night, and then it just deletes it.

4    Q.  Okay.  So we see you in these photographs in the

5    sentencing memorandum, and then, in the video that we just

6    watched, we see you taking some videos at various times.

7    What application did you use to take the videos during the

8    period of time that you were in the videos that we just

9    watched?

10   A.  Snapchat.

11   Q.  Okay.  Was there -- and your testimony is that

12   application automatically deletes the videos and photographs

13   that you take at the time with that; is that correct?

14   A.  Yes, sir.

15   Q.  Is that what happened with these videos --

16   A.  Yes, sir.

17   Q.  -- the government is alleging that you destroyed?

18   A.  Yes, sir.

19   Q.  Okay.  Did you destroy those videos?

20   A.  No, sir.

21   Q.  It's just part of the application that automatically

22   deletes it?

23   A.  Yes, sir.

24   Q.  Okay.  Thank you.

25           Mr. Griswold, we just heard the government argue

1    that you had heard some flash bangs on the other side of the

2    Capitol grounds, and there's some -- I would like to clarify

3    exactly what it is that you experienced on this particular

4    day with regard to the flash bangs that caused you to

5    actually change your course of movement, okay?  That's what

6    we're going to talk about.

7              When you got -- first of all, where did you go

8    initially when you got to D.C.?

9    A.  That day on the 6th --

10   Q.  Where is the first place you went?

11   A.  The hotel.

12   Q.  Okay.  And then after that you went to...?

13   A.  We went to sleep and then woke up and went to the

14   Ellipse.

15   Q.  Okay.  So you went to the Ellipse, and you heard the

16   president's speech.

17              And then you went somewhere after that.  Where did

18   you go after that?

19   A.  To the hotel room to drop off my flag and get a thicker

20   jacket.  It was extremely cold that day.

21   Q.  Okay.  So the jacket that you wore to the president's

22   speech was insufficient.  You went back and got your heavier

23   jacket?

24   A.  Yes.

25   Q.  Do you live in Florida?

1    A.   Yes.

2    Q.   Do you have a ton of jackets?

3    A.   Not a ton.

4    Q.   Is the camouflage jacket that you were wearing that day

5    the only heavy jacket that you own?

6    A.   It is the only one that I have that is not like a rain

7    jacket, I would say.

8    Q.   Okay.  So in reading the sentencing memorandum, there

9    was no design of the type of jacket that you were wearing to

10   indicate any type of position that you had.  It's just

11   simply your only jacket that you have in Florida?

12   A.   Only winter jacket I have.

13   Q.   Okay.  So I want you to describe for Judge Cooper when

14   you -- so you left The Ellipse, and then you went somewhere.

15   Where was that?

16   A.   To the hotel, and then we went to the Capitol after

17   that.

18   Q.   Okay.  I want you to tell the judge about the green

19   space where you ended up at the Capitol and what your intent

20   was there and what happened specifically that changed you to

21   move from that position.

22   A.   My understanding was that we were all to go to the

23   grassy area.  Everyone in the crowd was saying that Trump

24   was going to come down and speak there so everybody thought

25   that was where the rest of the rally, I guess, was going to

1    be held.  And then when we got there -- I probably wasn't

2    there two or three minutes, and the flash bang hit from I'd

3    say me to you roughly.

4         THE COURT:  Before we get there, when you went

5    back to the hotel did you turn your television on?

6         THE DEFENDANT:  Honestly I don't remember.  I

7    don't think so.  It might have already been on.

8         THE COURT:  Did you see what was going on, if it

9    were on?  Did you turn on Fox News or CNN and see folks

10   climbing up the walls of the Capitol?

11        THE DEFENDANT:  I believe at the time I was at the

12   hotel the only footage that was on the TV was -- I want to

13   say it was Fox News, and it was showing all the people

14   walking at the time, when I had gotten to the hotel, from

15   the best of my memory.

16        THE COURT:  You still made a decision to leave

17   your hotel room and go to the Capitol?

18        THE DEFENDANT:  Yes, sir.

19        THE COURT:  Did you think twice about it?

20        THE DEFENDANT:  No, sir, but I didn't see anybody

21   doing anything wrong on the news at that point.

22        THE COURT:  Okay.

23   BY MR. KLOTZ:

24   Q.  Okay.  So you got to the green space at the Capitol, and

25   then something in -- something happened.  About what was the

1    number of feet or yards between you and the flash bang that

2    happened?

3    A.  I would say ten.

4    Q.  Okay.  And was that at the point that you and your mom

5    and your brother --

6    A.  We were all standing there, yes.

7    Q.  -- split up?

8         Is that when you ended up going up to the steps?

9    A.  Yes, I went --

10   Q.  Okay.

11   A.  -- off towards the...

12   Q.  In the sentencing memorandum of the government they

13   talked about a text that you sent to your wife about having

14   stopped somebody from breaking a window, and the government

15   seemed to be saying that that was self-aggrandizing or

16   something that may not really have happened.

17   A.  Well, I didn't --

18   Q.  Can you tell us what you actually saw and stopped from

19   happening as you were moving from the grassy area towards

20   the stairs.

21   A.  There was what I believed to be a three-and-a-half-foot,

22   four-foot tall No Smoking sign with like a 10 by 6 sign

23   plate at the top of it, and somebody did grab that.  It was

24   a guy in an orange shirt.  And he pulled it back, and he was

25   about to hit a window, and, like, me and my buddy Scott

1    grabbed him and was, like, "Don't do that, don't do that."

2            And then he put it down, and another cop came up,

3    and we said, "You should take this.  Somebody's going to

4    break a window with it," and a blue shirt officer grabbed it

5    and took it.

6    Q.  Okay.

7    A.  It was a female officer.

8    Q.  I heard the government say a second ago during their

9    presentation that you didn't turn yourself in.  Can you tell

10   Judge Cooper about what happened with you coming from your

11   home in Niceville over to Pensacola to surrender to the FBI.

12   A.  Yes.  As soon as I -- they knocked on my door while I

13   was at work, and I have a Ring camera so I saw it.  And as

14   soon as I saw that, I contacted my family attorney that I

15   have used in the past, and he instructed me that I should

16   call Chris.

17           So I called Chris, and then we called the FBI, and

18   we set up a meeting, I believe, rather quickly after that.

19   Q.  And did you come and turn in your telephones at the end?

20   A.  Yes.  When he asked -- when the FBI agent asked me to, I

21   immediately came and surrendered myself.

22           MR. KLOTZ:  Judge, those are the only questions I

23   had.

24           THE COURT:  Okay.  Ms. Loeb.

25           MR. KLOTZ:  Thank you.

```
 1              MS. LOEB:  Thank you, Your Honor.
 2                      CROSS-EXAMINATION
 3     BY MS. LOEB:
 4     Q.  Mr. Griswold, you've seen the government's sentencing
 5     memo.
 6     A.  Yes, ma'am.
 7     Q.  And you've seen some of the evidence that we have
 8     produced in discovery in this case.
 9     A.  Yes, ma'am.
10     Q.  You know that the government has recovered photos from
11     your phone.
12     A.  Yes, ma'am.
13     Q.  The government -- but you saw in the sentencing memo the
14     government recovered no photos or videos from your phone
15     from the photo application between January 4th and January
16     13th.
17     A.  Yes.
18     Q.  And you texted some photos from January 6th that day
19     using your regular text messaging application.
20     A.  Yes, ma'am.
21     Q.  And you received text messages from your mother about
22     the police coming, and your phone didn't have any response
23     to that.
24     A.  No, ma'am.
25     Q.  And your wife texted you "In your camo.  I love it."
```

1    And from your phone there was no photograph leading up to

2    that.

3    A.  Yes, ma'am.  Can I answer that?

4    Q.  Yes.  You've answered the question.  Thank you.

5    A.  Okay.

6              THE COURT:  Well, why don't we stop.

7              Explain, Mr. Griswold, why there were no photos on

8    your phone from the 4th through the --

9              THE DEFENDANT:  Well, my wife -- I'm sorry.

10             THE COURT:  Let me finish.

11             THE DEFENDANT:  I'm not good at this.

12             THE COURT:  I know you're nervous.  I know you're

13   nervous.  Just relax.  I know you're nervous.

14             The 4th through the 12th; is that correct?

15             MS. LOEB:  13th, Your Honor.

16             THE COURT:  The 13th.  Explain that.

17             THE DEFENDANT:  The no text messages?

18             MS. LOEB:  No photos or videos in your photo

19   application, but there are before and after that.

20             THE DEFENDANT:  All videos that I took is because

21   I was on Snapchat.  That's why there was no videos.  I

22   usually don't take videos, that I can remember, on my phone.

23   I used to always use Snapchat videos.  I deleted Snapchat

24   after this happened.

25             THE COURT:  What about photos?

1          THE DEFENDANT:  Photos, I might have deleted the

2     photos, my selfies, from inside.

3     BY MS. LOEB:

4     Q.  So you deleted the Snapchat application after January

5     6th?

6     A.  No.  Whenever I got my new phone after I had my issues

7     with memory, I just didn't re-upload it.

8     Q.  And the FBI did recover one -- so you didn't delete

9     Snapchat?

10    A.  Not delete it.  I don't use it anymore.

11    Q.  And the FBI did recover a video that you took in the

12    Senate gallery, which is not facing toward the chamber,

13    which you did send in a text message to your mother.

14    A.  And that one probably came from -- you can send stuff

15    from Snapchat, and it doesn't save it.

16    Q.  So that was the only January 6th video that you --

17    A.  Sent?

18    Q.  -- sent via text message?

19    A.  I believe so.

20    Q.  At the hotel I think you just testified that you weren't

21    watching television, that you don't remember watching

22    television.

23    A.  I said I don't remember.  I believe Fox News was on, and

24    what they were showing was just people walking -- like there

25    was no video of the Capitol at that time.  It was people

1    walking from The Ellipse to the Capitol.  It was a video of

2    the street.

3            So that was all that I visually saw on the news

4    when I was in the hotel, was people walking from one

5    location to another location.

6    Q.  And you were also following social media that day?

7    A.  Not at this time.  None of the phone signals were

8    working anywhere other than inside of that building.

9    Q.  So you weren't checking social media that day?

10   A.  No, ma'am.

11   Q.  Except for when you went on Snapchat to take those

12   videos and send them?

13   A.  Well, that was just taking videos.  I wasn't like --

14   it's not like I was checking what was going on.  I was just

15   taking videos.

16   Q.  So Snapchat was working, but social media wasn't

17   working?

18   A.  Inside of the building only, yes.

19   Q.  Didn't you tell the government that social media was

20   where you had gotten the idea to put your flag -- leave your

21   flagpole in the hotel --

22   A.  Yes.

23   Q.  -- because it would be perceived as a weapon?

24   A.  Yes, because in the weeks --

25   Q.  It's just yes or no.

1          MR. KLOTZ:  Your Honor, may he explain?

2          THE COURT:  Overruled.  I'll allow him to address

3    the Court.

4          MR. KLOTZ:  Yes, Your Honor.

5    Q.  Mr. Griswold, you can continue your answer.

6    A.  Can you say the question one more time.  Sorry.

7    Q.  Didn't you tell the government that you learned from

8    social media that you should leave -- following social media

9    was what gave you the idea to leave your flagpole at the

10   hotel?

11   A.  Yes, ma'am, because in the weeks leading up to that I

12   seen several folks on Facebook saying, if you were going, do

13   not take a flagpole anywhere other than The Ellipse because

14   people will assume it was a weapon, and you could be

15   targeted for that reason.  In the weeks leading up to.

16   Q.  So you were aware of the potential for violence that

17   day?

18   A.  No.  I read a text on the social media that said people

19   would think that, if you had a flagpole, you could be

20   misconstrued as a weapon.  I didn't want someone to think

21   that I was being that way.

22   Q.  So you didn't -- you weren't aware of the potential for

23   at least conflict that day at the Capitol when you left your

24   flagpole?

25   A.  No, ma'am.

1   Q.  You also just described stopping -- you turned in

2   something that could have been used to break a window.  You

3   told the police about it when you were at the Capitol.

4   A.  Yes, ma'am.

5   Q.  And do you recall meeting with the government at the end

6   of May?

7   A.  Yes.  With the phone?

8   Q.  Yes.

9   A.  Yes.

10  Q.  And we talked through in detail what you did at the

11  Capitol that day, didn't we?

12  A.  Yes, ma'am.

13  Q.  And did you describe this incident to the government

14  then?

15  A.  No, ma'am.

16  Q.  And at the end of the interview I asked you if you had

17  anything else to add, and you didn't bring this incident up

18  then as part of the interview, did you?

19  A.  I didn't think it was pertinent; so no, I didn't.

20  Q.  You didn't think it was pertinent?

21  A.  No, ma'am.  I thought it was about my actions.

22  Q.  And when you turned that item into the police, you knew

23  there was a risk it would be used to break the window, or

24  you were concerned it might be used to break the window.

25  A.  Yes, ma'am.

1   Q.  So you knew at that time or you believed people might be

2   breaking into the Capitol?

3   A.  I believe the guy that was holding the flagpole was

4   trying to do something, yes.

5   Q.  And then you still later that day chose to enter the

6   Capitol yourself?

7   A.  Yes, ma'am.

8   Q.  Finally, Mr. Griswold, you described what happened

9   when the FBI came to knock on your door.  Did you turn

10  yourself -- that was in late January of 2021.  Do I have

11  that right?

12  A.  I believe so, yes.  It's been a while.

13  Q.  Did you go to the FBI at any time before that to turn

14  yourself in?

15  A.  No, ma'am.

16          MS. LOEB:  Nothing further, Your Honor.

17          THE COURT:  Okay.  Thank you.

18          MR. KLOTZ:  I just have one follow-up, Judge.

19          THE COURT:  Briefly.

20                    REDIRECT EXAMINATION

21  BY MR. KLOTZ:

22  Q.  Mr. Griswold, how did your wife know that you were

23  wearing a camouflage jacket?

24          There's an issue of did you delete a picture that

25  you sent her.  How did your wife know you had a camouflage

1  jacket?  Where did she see that?

2  A.  A friend of ours from Florida had seen something on the

3  news, took a picture of the TV, and then sent it to her.

4  And that was how she had seen that.

5  Q.  Okay.  So it's not as if you took a picture --

6  A.  I didn't send her any pictures.

7       MR. KLOTZ:  That's all I have, Judge.

8       THE COURT:  Okay.  You can step down,

9  Mr. Griswold.

10      THE DEFENDANT:  Thank you.

11      MR. KLOTZ:  Judge, just so I'm with you

12 procedurally, now would be the time that you want me to

13 respond to the government's argument that you made?

14      THE COURT:  That's right.  Address the sentencing

15 factors and any rebuttals.

16      MR. KLOTZ:  And then at the appropriate time I do

17 know that Mr. Griswold has a final statement he'd like to

18 make to the Court.

19      THE COURT:  Very well.

20      MR. KLOTZ:  Thank you, sir.

21      And the only reason why I really -- very rarely

22 would I call a witness like this in a sentencing hearing,

23 but there were some very specific factual allegations that

24 were assumptions that were made in the government's

25 sentencing memorandum which were just not correct.

1          There's -- we have testimony that there's an

2     innocent reason for why there were no videos on his phone.

3     Mr. Griswold has stated that he thinks he deleted one or two

4     texted videos, but those -- I'm sorry, still images, but

5     those images were recovered by the FBI when they did a

6     search of his text messages, so they were there.

7          There was a lot made in the memorandum about it's

8     something that the Court should consider, that he destroyed

9     evidence, in considering as to what type of sentence you're

10    going to impose in this case, and I thought it was very

11    important for the Court to hear from him that he did not --

12    even though you see him taking the videos throughout the

13    process, those are some things -- and I don't know if the

14    Court's familiar with how Snapchat works.  I had to ask my

15    kids about it.

16               THE COURT:  You and me both.

17               MR. KLOTZ:  And so those videos just go away.

18    They're not preserved in your phone, and it's something that

19    was not an insidious attempt to destroy evidence on his

20    part.

21          It's very interesting -- always interesting when

22    you have two people looking at a videotape and they perceive

23    it in very different ways.  I've watched that videotape

24    probably more than 50 times, and I see Mr. Griswold getting

25    pushed from behind at points.  I see the cameraman, who is

1    the news outlet person, getting pushed forward himself,

2    and he was standing either just behind or just in front of

3    Mr. Griswold.  And so it's -- you know, if you watch that

4    video, it's very easy to see it if you're looking at it from

5    an eye of it's bad or an eye he's getting pushed.  I mean,

6    really you can look at it and see both things.  It just

7    depends on what you care to look for.

8            In there, though, it's undisputable that as he was

9    coming through the door he was holding himself with one hand

10   as he was getting pushed from behind, and then a gentleman

11   grabs him by the collar or some part on his jacket and pulls

12   him in.

13           I understand that doesn't necessarily negate the

14   fact that he's there in the first place, but as you are able

15   to see the glimpses of his mouth and as you're able to see

16   the glimpses of his hand when he's holding the phone, he

17   is not actively pushing people in front of him.  And he is

18   not -- in the instances where you are able to see his mouth

19   in the video, you are not able to see him joining in the

20   chants.

21           And then that audio portion you're not able to

22   actually hear him, although you're able to hear people

23   around him saying things.

24           I'm not saying this to minimize his presence, but

25   I am addressing them because they're issues that are

1     presented in the government's memorandum in support of a

2     harsher prison sentence because I do think that in these

3     instances there's just -- like the example of the Snapchat.

4            I'm not sure if the government knew that he was

5     actually using Snapchat or not.  It's certainly something

6     that you can tell by looking at the screen of the phone,

7     that it actually is a Snapchat application.  And so if you

8     choose to look at it from a point that you want it to be bad

9     without knowing all the facts, you can do that, but when you

10    look at it on the whole, there's an explanation for a lot of

11    the conduct that he did.

12           Again, not excusing his presence there in the

13    first place, but it's somewhat of a matter of how it gets

14    spun to the Court, and so I wanted to address those things.

15           The sentencing memorandum, again, of the

16    government talks about the flash bang.  That happened

17    approximately 10 or 15 yards away from him.  And the Court

18    has heard that his intent was to remain in that grassy area.

19    Once that happened, it kind of dispersed everybody from

20    there.

21           Again, not making excuses for where he ended up

22    near the door, but at the same time he did not start out

23    intending to go up the stairs and going into the door that

24    you saw him go in.

25           In reading the sentencing memorandum, Judge, and

1     also the presentence investigation report, you can see that

2     when Mr. Griswold was debriefed by the FBI, which he drove

3     over to Pensacola to come do that, there was nothing in

4     the --

5                 THE COURT:  Can you move that mic just a little

6     bit closer to you.

7                 MR. KLOTZ:  I'm just having a hard time seeing you

8     through the glass.

9                 There's no indication by the FBI that anything

10    that he related to them was deceitful or untrue or trying

11    to evade responsibility, although I have seen many

12    other sentencings, Judge, as everybody, I'm sure, has --

13    lawyers -- who have studied other sentencings that have

14    happened.  You've seen many instances in which the person

15    who has pled and then been debriefed has been untruthful

16    with the FBI or lack of remorse with the FBI.  In this

17    particular case he was both truthful with the FBI and

18    remorseful, I believe, when he talked to them.

19                If I may just address for a second, Judge, the

20    prior criminal history.  For somebody that actually ends up

21    falling into a criminal history category of 1, he has quite

22    a bit on the PSI.

23                I can let the Court know that Mr. Griswold has

24    been sober for three and a half years now, and the Court

25    will notice, as you're looking through most of his prior

1    criminal history, it relates to probably alcohol abuse, and

2    he has made a change in his life in that regard.

3              Because it is mentioned in the PSR, I just wanted

4    to --

5              THE COURT:  In the same vein, the probation office

6    recommends a substance abuse testing condition.  I noticed

7    that he has a medical marijuana card.  In those cases, while

8    the Court might have a concern about substance abuse, he's

9    only going to test positive, and I don't want to be here

10   having HOV reports for positive marijuana tests, and so I

11   guess the question is, as a condition of any probation or

12   supervised release, what's your view on, A, a substance

13   testing provision and, B, a mental health treatment

14   condition?

15             There are some indications of some mental health

16   issues that I won't go into in the PSR.  Do you have a view

17   on that?

18             MR. KLOTZ:  I'm sorry, Judge.  I forgot I had my

19   glasses on my head.  I wasn't trying to be disrespectful.  I

20   completely forgot about that.  I'm very sorry, Judge.

21             So as to the -- his main problem was alcohol,

22   Judge.  He quit drinking alcohol about three and a half

23   years ago.

24             He has had his medical marijuana card, which is

25   current with his prescription and with his doctor visits.

1          Mr. Griswold, how long have you had that?

2          He's had that for two and a half years, and there

3     have been no -- to my knowledge, any kind of violations of

4     the use of that particular prescription that he has.  So if

5     the Court is going to craft a sentence that involves a

6     substance abuse evaluation, Mr. Griswold has found the

7     prescription to be very efficacious for the issues for which

8     he uses it, and that would be something that we would

9     petition the Court to consider, please, to allow him to

10    continue to be able to do that.

11         The main problem that he had had was with alcohol,

12    and I brought that up in the context of just why there were

13    so many prior offenses on there.  But if you want to address

14    that in greater detail with us, I'm happy to.

15         THE COURT:  All right.  What about the mental

16    health condition?

17         MR. KLOTZ:  Your Honor, if you provide -- that

18    would not be a problem, if you impose that as a condition of

19    his probation.  I think that is something that would

20    probably be of benefit.

21         May I continue, Judge?  I'm getting close.

22         THE COURT:  You may.

23         MR. KLOTZ:  Thank you, sir.  It's along the same

24    lines as the issue of the Snapchat and putting a spin on it.

25         I think it's interesting that the government has

1    chosen to paint as a bad thing that he actually took the

2    flagpole back to the hotel.  That's been spun in a way that

3    he anticipated violence.  When you heard his testimony, it

4    was really that he was not trying to escalate anything and

5    wanted to not cause a situation where something would be

6    escalated.

7         Again, that's one of those issues that you can

8    look at it really in both ways, but I think, had he made a

9    choice to bring it with him, he certainly would be, you

10   know, condemned for having brought something that could be a

11   weapon with him.  But he took the steps to try not to be in

12   a position where someone was going to assume he was

13   escalating, so he was trying to take some steps to try to

14   mitigate that particular issue.

15        Your Honor, if I -- I'd like to, if I may, just

16   talk about a couple of sentences that have been imposed

17   previously only for the position of proportionality of the

18   actions and then just to the argument that the punishment

19   shouldn't be greater than necessary in a particular case.

20   Some of these cases I'm not going to get deeply into because

21   they were actually your sentencings, and only one of the

22   ones that I have to talk about is a felony.  Most of the

23   other ones are misdemeanors.

24        I'll let the Court know that in this particular

25   case I lobbied very hard for the government to reduce this

1    case from a felony to a misdemeanor, and Mr. Griswold, from

2    the very outset, said that he wanted to accept

3    responsibility for this, and he did not want to go to trial.

4    And so we were forced into a position where he had to make a

5    decision, even though we were not able to get a misdemeanor

6    recommendation in this particular instance, of going ahead

7    and accepting responsibility and mitigating it through the

8    sentencing colloquy.

9          I would have preferred greatly that he would have

10   been offered a misdemeanor in this case, and the reason why

11   I bring this up, Judge, is because the conduct that is cited

12   in the government's sentencing memorandum in many other

13   cases where misdemeanors were offered is almost identical,

14   and in some cases it's actually even more offensive or even

15   more egregious.

16         When somebody gets sentenced on a felony, that, as

17   the Court is aware, is almost a form of punishment in

18   itself.  Mr. Griswold -- because we live in between actually

19   about three or so military bases in the Pensacola/Niceville

20   area, Judge, his ability to engage in those particular

21   contracts --

22         THE COURT:  Let's go back to the disparity.  Which

23   of any of my prior cases do you believe this is analogous

24   to?

25         MR. KLOTZ:  Yes, sir.  And I'm not saying the

1   Court has treated anybody disparately.  I'm saying the

2   charging decisions made leading up to that.  So I wasn't

3   pointing that at the Court.  I was pointing it at the

4   charging decisions.

5          But in -- yes, sir, so I'll kind of run through

6   quickly the ones that I had.

7          Danielle Doyle.  Judge, she was sentenced by Judge

8   McFadden on 10/21 --

9          THE COURT:  Any of mine?

10          MR. KLOTZ:  Yes, sir, Judge.  I have some of

11   yours.

12          THE COURT:  As you know, there are so many facts

13   that go into each case it's very difficult to assess the

14   proportionality for cases that are with other judges.

15          MR. KLOTZ:  Understood, Judge.  I'll start out

16   with Gracyn Courtright.  She actually made it to the floor

17   of the Senate in this particular case.  There's a photograph

18   of her carrying one of the --

19          THE COURT:  I know the case.

20          MR. KLOTZ:  Yes, sir.

21          THE COURT:  She got a year -- I'm sorry, a month,

22   30 days.

23          MR. KLOTZ:  Yes, sir, she got a 30-day offer on a

24   misdemeanor in her case, but the conduct seems very similar

25   to what is alleged in this particular case.  She made

1    statements to social media, and she actually made social

2    media posts.  In that case it was a misdemeanor offer,

3    fortunately for her.

4         The other case that I had to talk about, Judge,

5    was Dr. Simone Gold.  I know you're very familiar with that

6    case.  Again, she ended up having very similar conduct to

7    Mr. Griswold, and luckily for her she was able to get a

8    misdemeanor offer, and she ended up with 60 days jail in

9    that particular case.

10        One thing that was very -- bear with me, Judge.

11   Court's indulgence.

12        (Pause)

13        MR. KLOTZ:  In her particular instance, the points

14   that were similar or exceeding Mr. Griswold's were that

15   there's an allegation that there was an officer who was

16   assaulted right in front of her, and she was giving speeches

17   on a megaphone inside of the Capitol building.  And

18   additionally she ignored police commands to leave.

19        There's no evidence -- and I believe, if

20   Mr. Griswold was to get back on the stand, he would say

21   nobody ever asked him to leave.  He made his way out on his

22   own will, but he never disobeyed a request to leave.

23        A couple other cases that you had, Judge, were the

24   two young people that I believe were maybe from Georgia,

25   Savannah McDonald and Nolan Kidd.  Again, fortunately for

1   them, Your Honor, they were offered misdemeanor offers,

2   and, in similarity to the facts alleged in our case where

3   Mr. Griswold was not, they actually -- these individuals

4   were alleged to have joined a group in a stand-off with the

5   police.  They remained inside for 40 minutes.

6           In their debrief at least one of them lied to the

7   FBI about what had happened so in their debrief they were

8   dishonest.  They said -- I can't remember which one it was.

9   I think they were a couple that went in together.  They said

10  that they were between the first 100 and 150 people that

11  actually got inside of the Capitol.  They gave interviews

12  afterwards, and they made social media posts.  They ended

13  up, as the Court knows, with a 21-day sentence and a 45-day

14  sentence on a misdemeanor in their cases.

15          I think the last case that I have of you was

16  Mr. Eric Barber.  You sentenced him last month.  That, as

17  you know, is the gentleman who is a former councilman.  I

18  don't know if it's county councilman or city councilman, but

19  he was wearing a helmet.  He said he was going to D.C. to

20  punch Antifa terrorists in the face.  He entered a

21  restricted hallway outside of Speaker Pelosi's office.

22          He entered not through a door, but he climbed

23  through a broken window.  He entered a private part of the

24  building.  He was live-streaming video and had social media

25  posts, and he has a prior felony conviction.  He was offered

1    a misdemeanor and received a 45-day jail sentence.

2            So the only reason I guess I'm bringing these up,

3    Judge, is that the government has asked towards the top end

4    of the guidelines range in this particular case because they

5    believe that he should receive the greater punishment.  My

6    position is, Your Honor, that having received a felony is

7    already a very significant punishment for him, and that he

8    is going to have to carry that around as he navigates his

9    career throughout the rest of his life.

10           Judge, may I just address one case that was not

11   yours just briefly?  West Virginia Representative Derrick

12   Evans, who was sentenced last month by Judge Lamberth.  He

13   received a three-month jail sentence on a felony civil

14   disorder.  He had the same guideline range as Mr. Griswold

15   did.  He had a zero to six guideline range, and the United

16   States asked for three months in his case.

17           And what I found just so disparate between these

18   two individuals is that Mr. Evans, in his case, he was

19   wearing a helmet.  He live-streamed the riot on Facebook.

20   He bypassed The Ellipse rally and went straight to the

21   Capitol.  He has 3,000 Facebook followers that he encouraged

22   to come to the Capitol.  He actually actively yelled at the

23   police -- I guess it was video communication with the police

24   saying, "We're taking this house.  I told you today,

25   patriots stand up," and then he deleted the video later that

1    day.  He met with the FBI twice, according to the reports

2    that I've read, and made false claims to the FBI.

3           This gentleman, he's charged as a felon.  The same

4    as Mr. Griswold.  But in that particular case the government

5    asked for three months.  It appears that he got -- it looks

6    like he got three months in jail in that particular case,

7    which is two months less than they're asking for in this

8    particular case.

9           But one of my points is, Judge, that that

10   gentleman's conduct was so much more over the top compared

11   to Mr. Griswold.  I respectfully hope that I'm not being

12   completely unreasonable in asking for a probationary

13   sentence for Mr. Griswold or consideration for perhaps home

14   confinement in this case.

15          A couple of other just kind of housekeeping issues

16   to bring up besides the argument, Judge.

17          The government has no opposition if the Court

18   would allow, if you do impose a jail sentence, to a self-

19   surrender date that would be in approximately 90 days.  That

20   would give him a chance to wrap up some of the contracts

21   that he has.  And I talked with the government about that

22   before today, and they did not have an objection to that.

23   He has been in full compliance with I think all of the

24   conditions of the presentence release.

25          He does have a medical cannabis card, Judge, which

1   has been very efficacious for pain issues that he has.  I'm

2   not sure that it might -- I'm sorry, I can't remember.

3   There may be some anxiety issues that also helps with,

4   Judge, but he's been compliant with that and has not had any

5   criminal accusations really since he stopped drinking three

6   and a half years ago.

7          He has fully cooperated with the United States and

8   the FBI.  And I know this is only briefly mentioned in the

9   sentencing memorandum, Your Honor, but he did identify a

10  previously unknown entrant into the -- we did not ask for --

11  we didn't really ask for a cooperation deal, Judge.  I just

12  told the government that I would -- you know, we would relay

13  this to you during the appropriate time.  So we don't have a

14  cooperation agreement or anything like that, but somebody

15  that I believe had not previously been identified was

16  identified by him, which he had really wrestled personally

17  with, whether to do that.  So he's done that at somewhat

18  great expense to him.

19         He has self-surrendered his phones.  He has got no

20  history of any association with violent or seditious groups

21  in his past.

22         And I know that the government has attempted, in

23  their sentencing memorandum, to discount a lot of the things

24  that he has, I think, sincerely said in his allocution to

25  the Court by spinning them in a way that he's not taking

1    responsibility.  I can let the Court know that he is -- and

2    he'll speak for himself when he does, but he has shown a

3    great deal of remorse for this.

4          I don't know that there's anybody that has come in

5    front of the Court on any of these cases or really in 29

6    years of doing this, Judge, where somebody -- it's hard to

7    task somebody for not taking responsibility for feeling

8    remorse as he was walking down the Capitol steps.  That

9    feeling doesn't usually develop for anybody who is accused

10   of a crime until sometime afterwards.

11         I believe that he has sincerely expressed that.  I

12   did some -- honestly on the allocution, he pretty much wrote

13   that.  I did some minor spelling edits and things for him,

14   but that was from his heart, and I think that there is an

15   explanation just as the government has an explanation as why

16   they believe that it's disingenuous.  I believe that it is,

17   and I believe that hopefully we've provided some explanation

18   to the Court as to why those things are genuine, and I'm

19   just asking that you consider a probationary and/or a home

20   confinement sentence in this particular case.

21         THE COURT:  Very well.

22         Ms. Loeb, would you like to address, very

23   briefly, the obstruction issues.  And then we'll hear from

24   Mr. Griswold.

25         MS. LOEB:  Thank you, Your Honor.

1      Today was the first time I heard anything about

2  Snapchat, and we did sit with the defendant for a debrief,

3  and there was -- there was no -- there was no discussion of

4  it then or of --

5      THE COURT:  But now that there has been a

6  discussion and a statement under oath, do you -- what's your

7  view as to whether or to what extent obstruction should play

8  into the Court's determination today?  Because it did play a

9  fairly prominent role in your memo.

10      MS. LOEB:  Your Honor, I still find it suspect

11  that there are no photos or videos at all just between

12  January 4th and 13th, between that limited period, and that

13  his -- the only text message to -- the text messages to his

14  friend who was in there with him start on January 22nd.  I

15  don't know what would explain that interruption.

16      In addition, the text messages to his mother, it

17  appears that when they trade messages off they react to

18  things that they're sending, and we just don't see that

19  during the period.

20      So I don't have anything to dispute that he's

21  using Snapchat at those two moments, but I think that there

22  are still serious issues that his testimony doesn't resolve.

23      THE COURT:  Okay.  Very well.

24      Mr. Griswold, anything you want to tell me before

25  I pronounce your sentence?

1              Come to the bench.

2              THE DEFENDANT:  I just want to apologize for that

3    day.  If I could go back and not do that, not have gone, I

4    wouldn't.  I know that what happened was wrong.  I know that

5    my actions were wrong.  I feel horrible for the police

6    officers that went through what they went through and all

7    the Congress people that went through what they went

8    through.  There's no excuse for it.  It was wrong.  I'm

9    sorry.

10             THE COURT:  Okay.  Thank you.

11             All right.  Stay up there, sir.

12             We obviously have hundreds of these cases.  Each

13   one is different.  When we talk about guidelines ranges and

14   these calculations, it makes it seem much more formulaic

15   than the process really is.

16             You know, I try to take all of the surrounding

17   circumstances and factors into account.  I'm not the kind of

18   judge that lectures defendants, but I do have an obligation

19   to tell you how I've arrived at the sentence that I've

20   arrived at.

21             Our starting point obviously is the sentencing

22   guidelines.  In this case, as we've said, they're zero to

23   six months.  I think that that fairly encompasses the range

24   of your involvement that day, and the question is where

25   within that range you fall.

1          In terms of your conduct on January 6th, you were

2     not a leader.  You were not a planner.  You were not, as far

3     as I know, a member of any militant group.  You didn't

4     directly assault anybody.  You didn't break anything or

5     steal anything, and so, you know, that certainly places you

6     on the lower end of culpability, certainly, as compared to

7     other felony defendants that I see.

8          On the other hand, you were not just a casual

9     bystander that day.  You were a willing participant, in my

10    view, in a very aggressive mob of people.  You helped that

11    mob push through the Rotunda doors knowing there was a

12    police line there trying to protect those doors and defend

13    them.  You obviously saw that it was a very dangerous

14    situation, but you proceeded anyway.

15         And you celebrated the breach once you were there

16    clearly showing that you were proud of your actions.

17         As you proceeded through the hallways, you knocked

18    on office doors and chanted announcing your presence as you

19    made your way to the Senate Chamber.

20         As an aside, you know, I don't know whether there

21    were Senate staffers or House staffers behind those doors,

22    but I do know that there were a lot of folks there that day

23    who had barricaded themselves in their office and in their

24    conference rooms, and I can only imagine what went through

25    their minds as the mob of people chanted and banged on their

1    doors as they were cowering in their offices.

2          You also entered the Senate Chamber.  That

3    distinguishes your conduct from many.

4          In reading your letter, I think that there was

5    some genuine remorse there, but there is this overall notion

6    that you were swept up and pulled in and lacked agency or

7    free will or deliberation in going through the Capitol that

8    day, and I agree with Ms. Loeb that that is not consistent

9    with the videos that were shown.  And, of course, you vowed

10   to do it again.

11         So in short, it was clear that you were an active

12   and deliberate participant and weren't just swept up by the

13   crowd.  And all of these actions distinguish you from the

14   lower level of defendants, particularly those who have

15   received probation.

16         I will say this as well, as I tell all of the

17   defendants, none of this has anything to do with the First

18   Amendment.  I don't care who you support in the election.  I

19   don't care if you thought that the election had been rigged.

20   This is not about your beliefs.  It is only about how and

21   where and when you chose to express them.

22         I appreciate the presentation today regarding the

23   obstruction of justice and the destruction of evidence.  I

24   was taken by that reading the government's memo.  I accept

25   your sworn testimony regarding the Snapchat videos.  I think

1    there are still questions as to why there are no photographs

2    or texts in the days before and immediately after the event.

3    It may be a very natural reaction in the heat of the moment

4    to delete your texts.  I can understand why someone would do

5    that.  But it is not entirely consistent with complete

6    remorse and acceptance of responsibility and the notion that

7    you just got swept up in the crowd or were not, you know,

8    dedicated to the cause that day.

9            You know, it's hard to express or it's hard to

10   assess how genuine a defendant's remorse is.  We mentioned

11   Mr. Barber, the city council person from West Virginia, a

12   few minutes ago.  He gave a very impassioned plea to me to

13   show leniency and expressed great remorse, and after his

14   sentence, the next day, he issued a public Twitter statement

15   denouncing the old prosecution and the sentence as being a

16   sham.  And so, you know, I think that you are genuine, and I

17   hope that your remorse is genuine and that you realize how

18   misguided and dangerous your actions were and that you've

19   thought twice about your vow to do it again.

20           THE DEFENDANT:  That's not happening.

21           THE COURT:  All right.  I also consider your

22   history.  You've had a few bumps in the road, but, to your

23   credit, you seem to be a hard working guy.

24           THE DEFENDANT:  I am.

25           THE COURT:  You seem to have a supportive wife,

1       who I hope you appreciate, and a relatively stable family.

2              There wasn't a lot of discussion today, but in the

3       memos there was a lot of discussion about the collateral

4       consequences on your kids and your finances.  You know, I

5       sentence a lot of defendants on a lot -- you know, a lot of

6       different kinds of cases apart from January 6th, and there

7       are almost always spouses and sons and daughters and family

8       members who are affected by the decisions that defendants

9       make, and so unfortunately that does not distinguish you

10      from very many other defendants that I see.

11             Luckily for you, I think your wife will be able to

12      hold down the fort, and I assume that you will have ample

13      job prospects when that time comes.

14             In terms of disparities, we talked about these

15      different cases.  Every case is different.  I think the

16      cases that Mr. Klotz mentioned are somewhere in the ballpark

17      of this one, and I am confident that the sentence that I

18      will impose will not create any unwarranted disparities

19      between this case and those.

20             So with that, pursuant to the Sentencing Reform

21      Act of 1984 and in consideration of the provisions of 18 USC

22      3553 as well as the advisory sentencing guidelines, it is

23      the judgment of the Court that you, Andrew William Griswold,

24      are hereby sentenced to the custody of the Bureau of Prisons

25      for a term of 75 days as to Count 1.  You are further

1    sentenced to serve a two-year term of supervised release as
2    to Count 1.  In addition, you are ordered to pay a special
3    assessment of $100.
4           While on supervision, you shall abide by the
5    following mandatory conditions as well as the standard
6    conditions of supervision, which are imposed to establish
7    the basic expectations for your conduct while on
8    supervision.
9           These mandatory conditions include you must not
10   commit another federal, state, or local crime.  You must not
11   unlawfully possess a controlled substance, and obviously, if
12   you possess a controlled substance pursuant to your valid
13   Florida medical marijuana license, that would not violate
14   that condition.  You must refrain from any unlawful use of a
15   controlled substance.  You must cooperate in the collection
16   of DNA as directed by the probation officer.
17          And you must make restitution in accordance with
18   18 USC Sections 3663 and 3663A or any other statute
19   authorizing a sentence of restitution.  The restitution
20   amount will be paid to the Architect of the Capitol in the
21   amount of $2,000.  The Court will waive payment of any
22   additional fine.
23          The payment of the total criminal monetary penalty
24   will be payable in equal monthly installments of $200 over a
25   period of 10 months to commence 30 days after your release

1    from imprisonment to a term of supervision.  You must

2    provide the probation office access to any requested

3    financial information and authorize the release of any

4    financial information.

5          The probation office shall share financial

6    information with the U.S. Attorney's Office.  You must not

7    incur new credit charges or open additional lines of credit

8    without the approval of your probation officer.

9          I will waive the substance abuse testing

10   condition, but I will impose a mental health treatment

11   condition.

12         You must participate in mental health -- a mental

13   health treatment program and follow the rules and

14   regulations of the program.  The probation officer, in

15   consultation with the treatment provider, will supervise

16   your participation.

17         The probation office shall release the presentence

18   investigation report to all appropriate agencies, including

19   the U.S. Probation Office in the approved district of

20   residence, in order to execute the sentence of the Court.

21   Treatment agencies shall return the presentence report to

22   the probation office upon your completion or termination

23   from treatment.

24         You have the right to appeal the sentence imposed

25   if the period of imprisonment is longer than the statutory

1      maximum or the sentence departs upward from the applicable

2      guidelines range.  If you choose to appeal, you must file

3      any appeal within 14 days after judgment.

4              You also have the right to challenge the

5      conviction entered or the sentence imposed if new and

6      currently unavailable information becomes available to you

7      or on a claim that you received ineffective assistance of

8      counsel in entering a plea of guilty to the offense of

9      conviction or in connection with sentencing.  If you are

10     unable to afford the cost of an appeal, you may request

11     permission from the Court to file an appeal without cost to

12     you.

13             You will be ordered to self-surrender on a date

14     after October 15th.  Counsel, does that work?

15             MR. KLOTZ:  The Court's indulgence, please.

16             THE COURT:  That's 90 days.

17             MR. KLOTZ:  Yes, sir.  Thank you.

18             THE COURT:  Okay.

19             And, Ms. Reichler, we will transfer supervision to

20     the Northern District of Florida, but not jurisdiction; is

21     that correct?

22             THE PROBATION OFFICER:  Yes, that's correct, Your

23     Honor.

24             THE COURT:  Okay.  The Court will transfer

25     supervision to the Northern District of Florida.

1          Any other objections for the record?

2          MS. LOEB:  No, Your Honor.  The government would

3     move to dismiss the indictment.

4          THE COURT:  Okay.  So moved.

5          Mr. Griswold, good luck to you.  You know, I tell

6     defendants that they should not ever be judged by the

7     biggest mistake that they've ever made.  I will tell you the

8     same thing.  You are a very young man.  You have a

9     supportive family.  Let's get this in the rear view mirror

10    and go on with your life and hope for better days, all

11    right?

12         THE DEFENDANT:  Thank you.

13         THE COURT:  We're adjourned.

14              (Whereupon the hearing was

15               concluded at 3:22 p.m.)

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8          Dated this 25th day of July, 2022.

9

10                                 /s/Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
11                                 United States Courthouse
                                   Room 6718
12                                 333 Constitution Avenue, NW
                                   Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25